[No. D048345. Fourth Dist., Div. One. Feb. 1, 2007.]

SHANDRALINA G., a Minor, etc., Plaintiff and Appellant, v.
TANIA L. HOMONCHUK, Defendant and Respondent.

## COUNSEL

Law Offices of Brian R. Riley, Brian R. Riley, Lorin R. Clark; Palecek, Skaja & Broyles, Dean R. Broyles, Carl J. Skaja and Robert M. Daniels for Plaintiff and Appellant.

The Medel Law Firm, Kenneth J. Medel and Katherine T. Weadock for Defendant and Respondent.

## OPINION

**McDONALD, J.**—In a medical malpractice action filed by plaintiff Shandralina G. (Minor), counsel for defendant Tania Homonchuk, M.D. (Doctor), retained Dr. Landers as a confidential medical consultant. Shortly before the time set for designating expert witnesses, one of Minor's counsel, Mr. Riley, unaware of Landers's prior retention by Doctor's counsel, telephoned Landers and, after Landers stated he was not familiar with the parties to the action, sent Landers certain medical records for his review. Minor's counsel thereafter designated Landers as a potential expert witness for Minor.

Doctor subsequently moved, under *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067 [29 Cal.Rptr.2d 693] (*Shadow Traffic*), to disqualify Minor's counsel from further participation in the action, alleging Riley had improperly obtained confidential information during his telephone call with Landers (the conversation). Doctor asserted the unauthorized contact by Riley with Landers created a rebuttable presumption that confidential information had been improperly disclosed by Landers to Riley during the conversation, and Minor did not sustain the burden of showing Riley had not obtained confidential information. Minor opposed the motion under *Collins v. State of California* (2004) 121 Cal.App.4th 1112 [18 Cal.Rptr.3d 112] (*Collins*), asserting the *Shadow Traffic* rebuttable presumption was not applicable because Landers remained under the control of Doctor, and therefore the burden of persuasion rested on Doctor affirmatively to show Riley *did* obtain confidential information from Landers during the conversation. Minor alternatively argued that, even if Minor had the burden to demonstrate Riley had not obtained confidential information during the conversation, affirmative evidence satisfied that burden.

The trial court granted the motion to disqualify Minor's counsel, concluding Minor had not satisfied the burden of proving the negative. Minor moved for reconsideration and submitted declarations from Landers averring he had not discussed confidential information with Riley during the conversation. The trial court rejected the motion for reconsideration, and this appeal followed.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *The Lawsuit*

In 2004 Minor filed this action against Doctor for medical malpractice and wrongful death after Minor's mother died from a pulmonary embolism. Minor was represented by Attorneys Broyles and Riley, and Doctor was represented by Attorneys Medel and Weadock.

---

[1] The courts have recognized that a motion to disqualify an attorney seeks to deprive a client of the right to chosen counsel (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 [86 Cal.Rptr.2d 816, 980 P.2d 371]), can impose substantial economic hardship on the innocent client (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1339 [104 Cal.Rptr.2d 116]), and may be subject to abuse (*McPhearson v. Michaels Co.* (2002) 96 Cal.App.4th 843, 850 [117 Cal.Rptr.2d 489]). An order disqualifying counsel is reviewed for an abuse of discretion but "involves concerns that justify careful review of the trial court's exercise of discretion." (*SpeeDee Oil, supra*, at pp. 1143–1144.) Accordingly, our factual and procedural background contains substantial detail because we must carefully review the evidence supporting the trial court's order.

## B. *The Involvement of Landers*

In February 2005 Weadock contacted Landers, a specialist in pulmonary medicine and a seasoned expert in medical/legal cases, and asked him to consult as an expert on behalf of the defense. Landers agreed to act as a defense consultant, and during this initial conversation Landers solicited information about the case from Weadock and offered information on issues, including pulmonary embolisms. Weadock agreed to forward the medical records to Landers for his review, and did so the following month. Landers reviewed the records and thereafter contacted Weadock and extensively discussed his opinions on the medical and legal issues, and confidential defense strategies and analyses.

### *The Conversation*

In July 2005, shortly before Minor's expert witness designation was due, Riley contacted Landers by telephone to ask whether Landers would serve as an expert witness on behalf of Minor. Riley identified the names of the parties involved in the lawsuit to determine if there were any conflicts of interest, and Landers did not state he was aware of the facts or parties involved in the lawsuit. However, Riley's version of the remaining content of the conversation, as presented by his declaration (filed in opposition to the motion to disqualify) and Landers's declarations (filed in support of Minor's motion for reconsideration), was contested by Doctor.

According to Minor's version, Landers received Riley's telephone call while Landers was at an airport in Pennsylvania about to board an airplane. The conversation lasted only two to three minutes, during which Riley did most of the talking. Landers's only comments to Riley were that he was at an airport about to board the plane, that he did not recognize Dr. Homonchuk's name and therefore did not believe there was any conflict of interest, and (after hearing Riley's description of the facts) agreed to review the medical records, which he asked be forwarded to his office. Riley agreed to send the records and asked Landers to contact Riley after Landers had the opportunity to review them and formulate his opinions or conclusions about the case. Both Riley and Landers unequivocally averred that during the conversation Landers neither communicated any opinions or conclusions about the case, nor revealed to Riley any confidential information obtained by Landers from Weadock.

### *The Subsequent Events*

Doctor relied on inferences from the following subsequent events to support the contention that Landers *did* reveal to Riley opinions or conclusions influenced by confidential information that Landers had obtained from Weadock.

First, on August 9, 2005, Minor served her "First Exchange of Expert Witness Information" designation and supporting declaration (the expert designation).[2] Minor identified Landers as an expert whose opinion would be offered, stating "Landers is expected to testify as to his review of [decedent's] medical records . . . , his pulmonologist opinion regarding issues including [Doctor's] breach of the standard of care, causation, pulmonary embolisms, and [decedent's] condition."

Second, Doctor averred that when Doctor's counsel received the expert designation, they immediately sent an August 11 letter to Landers, which apparently[3] reminded him of his prior involvement in the case, demanded he cease further contact with Minor, and informed him that Doctor would be seeking a court order disqualifying him as an expert. Weadock also placed telephone calls to Landers on August 11 and August 15.[4] Landers did not return those telephone calls or contact Doctor "throughout the period necessary to prepare briefs on the Motion to Disqualify counsel."[5] Medel speculated that Landers did not return the calls because Minor's counsel had told Landers not to contact Doctor's counsel.

---

[2] Prior to that designation, the parties participated in an August 2, 2005 private mediation. Doctor argued below, and reasserts on appeal, that Minor's counsel was "extremely knowledgeable" at that conference about the medical issues, apparently drawing the inference this expertise was attributable to Riley's conversation with Landers. However, Doctor provided no evidence to support the assertion that Minor's counsel was "extremely knowledgeable" at that conference, or that the expressed expertise so vastly exceeded the knowledge ordinarily possessed by attorneys who specialize in medical malpractice cases (and who had at least one year to become well versed in the facts of Minor's case) that the expertise was more likely than not attributable to Landers's tutelage rather than the attorneys' independent knowledge and training.

[3] Doctor's motion did not append the letter as an exhibit and our description of its contents is derived from Weadock's declaration synopsizing the letter. However, Weadock's description of the letter is consistent with Landers's averment that he understood, from the tone and content of the letter, that Doctor was moving to have Landers disqualified, he was to have no further contact with Minor's counsel, and he was no longer a defense consultant. Neither Weadock nor Landers suggested the letter asked Landers to contact Weadock.

[4] Contemporaneously, Weadock faxed an August 11 letter to Riley demanding Minor have no contact with Landers and informing Riley, for the first time, that Doctor had retained Landers as a consultant. Riley responded by a letter noting Doctor's expert designation contained no mention of Landers, nor had Landers indicated (during the conversation) he knew Doctor or the facts of the case. Accordingly, Minor demanded Doctor have no contact with Landers. Medel then apparently telephoned Riley on August 15, but there is no competent evidence of the content of that conversation. Accordingly, we disregard Doctor's effort on appeal to quote the conversation between Medel and Riley, as well as Doctor's effort to draw inferences from Riley's purported statements.

[5] Landers's declaration in support of the motion for reconsideration explained that, during the period Doctor was preparing the motion to disqualify Minor's counsel, Landers was on an extended vacation in an area of Pennsylvania without cellular telephone reception when Weadock placed the mid-August telephone calls to him. Accordingly, Landers did not receive those calls. Landers remained in Pennsylvania during the majority of August and September

Finally, while Doctor's motion to disqualify (which asserted in part lost "control" over Landers) was pending, Landers returned Medel's call and reiterated his willingness and availability to serve as Doctor's expert.

### C. *The Motion to Disqualify*

On August 29, Doctor moved ex parte to set a hearing on her motion to disqualify Landers and Minor's counsel. The court set the motion for September 23 and ordered Minor's counsel not to have contact with any experts.

In Doctor's moving papers filed August 31, Doctor argued Minor's counsel should be disqualified because, under *Shadow Traffic, supra*, 24 Cal.App.4th 1067, the court must presume Minor's counsel had improperly obtained confidential information from Landers, and Minor's counsel could not carry their burden to prove they had not obtained confidential information. Doctor argued Minor's counsel would not have named Landers in Minor's expert designation unless Landers had discussed the merits and revealed opinions and conclusions to Riley. Doctor also argued the *Collins* exception, which obviates the *Shadow Traffic* presumption and restores to the moving party the burden affirmatively to prove confidential information had been transmitted when the moving party retains control over the expert, was inapplicable because Doctor believed (based on Landers's lack of response to Doctor's efforts to contact him) Landers was no longer a defense consultant over whom Doctor had control.

Minor's opposition submitted the declaration of Riley, which explained the only contacts between Landers and Riley were (1) the two-to-three-minute conversation, during which Riley did most of the talking, and (2) Riley's letter forwarding the records to Landers; Riley stated Minor's counsel ceased further contact with Landers after the conflict surfaced. Riley denied Landers communicated any opinions or conclusions or revealed any confidential information during the two-to-three-minute conversation. Minor also argued the expert designation was not evidence Landers had revealed anything to Riley, because the expert designation (the deadline for which was August 11) specified Landers was "expected to testify" about certain subjects; these were *anticipated* areas of his evidence but Landers had not yet reviewed the records or provided any opinion or conclusions about the case and was on vacation when the deadline for the designation was to expire. Minor, arguing *Collins* applied because Landers remained under Doctor's control, asserted Doctor's counsel could not avoid *Collins* merely by unilaterally jettisoning their consulting arrangement with Landers.

---

and, during that time, received Weadock's August 11 letter, which he understood to mean he was no longer retained as a defense consultant. Apart from the conversation and Riley's letter forwarding medical records, Landers denied any contact with Minor's counsel.

Doctor's reply asserted the *Collins* exemption was inapplicable because it was undisputed in *Collins* that the expert had maintained his consulting arrangement with the moving party, but Doctor here had received no response to their attempts to contact Landers. Accordingly, asserted Doctor, *Shadow Traffic*'s rebuttable presumption remained applicable.

At the September 30 oral argument, Minor argued *Shadow Traffic* should not control, and instead *Collins* should apply, because (1) Riley's discussion with Landers occurred without knowledge of Doctor's prior retention of Landers, (2) Landers was under Doctor's control, and (3) Minor was barred by court order from contacting Landers and therefore could not produce a declaration from Landers verifying the absence of improper communications.[6] When Doctor was unable to complete oral argument, the court continued the hearing to October 6.

On October 3 or 4, Landers telephoned Doctor's counsel. Landers did not speak with Medel, but did leave a message on Medel's answering machine restating his willingness to act as Doctor's expert.[7] Medel speculated it was a sham call because it dovetailed too neatly with Minor's effort to apply *Collins* and avoid the *Shadow Traffic* presumption.[8]

The trial court, expressing concern over the expert designation and the telephone call, took the matter under submission and ultimately ruled that (1) Landers's telephone call to Medel did not show a continuing relationship to Doctor within the meaning of *Collins*, (2) Minor was therefore obliged under *Shadow Traffic* to prove by a preponderance of the evidence that

---

[6] Minor also argued that, if the court was inclined to affirm the tentative ruling ordering disqualification, the parties should be permitted to depose Landers to solicit evidence verifying the conversation was brief and contained no confidential disclosures to Riley.

[7] It is unclear why Landers's call was not put through to either Weadock or Medel. Although Medel asserted at oral argument that the timing of the call "struck me a little strange" and "raised my feelers," the precise content of the message is unknown because the tape was neither introduced as evidence nor (apparently) preserved. However, as related by Medel, Landers said, "Mr. Medel, gee, I'm sorry I haven't returned your calls. I've been busy and I've been out of town, but you know, I'm still your expert and I'm still available for you, and maybe I did the wrong thing by talking to the other side, but here I am."

[8] Minor did assert *Collins* "is directly on point now that Mr. Medel has admitted that Dr. Landers is his guy. . . ." The court asked Riley if he had any idea what prompted Landers's telephone call to Medel, and Riley said he did not know. When the court put the same question to Broyles (Minor's other counsel), Broyles replied that he had called Landers's office on September 30 before arriving for the initial oral argument. Broyles explained that, after reading the court's tentative ruling and perceiving that the court disbelieved Riley's declaration as to the content of the conversation, Broyles called to ask whether Landers was available to be deposed on the conversation to buttress Riley's declaration. However, Landers was out of the office for several days, and therefore Broyles left a brief message asking Landers to contact Broyles when Landers returned to the office. Neither Broyles nor Riley received a response to that message.

Landers did not convey confidential information during the conversation, and (3) Riley's declaration (while stating what Landers did *not* say) did not specify what Landers *did* say during the conversation that convinced Riley to include Landers on Minor's expert designation, and therefore inferred Landers did express medical opinions during the conversation. The court concluded Minor had not rebutted the *Shadow Traffic* presumption and ordered Minor's counsel disqualified.

### D. *The Motion for Reconsideration*

Because the court's ruling dissolved the bar against Minor's contacts with Landers, Minor contacted Landers and obtained a first declaration in support of Minor's motion for reconsideration. Landers's first declaration, discussing the context and content of his conversation with Riley, averred the conversation was extremely brief and Landers's only contributions were (1) he did not recognize the names of the parties or the fact pattern described by Riley and therefore believed there was no conflict of interest, and (2) he told Riley to send the records to him and he would review the case and contact him after review to discuss his opinions and conclusions. Landers denied communicating any opinions or conclusions during the conversation and considered the call to have been an administrative call for purposes of retaining him to review the case. He also stated he was unaware Minor had designated him as an expert but that in his experience it was not unusual for an attorney to designate him as an expert before he conveyed his opinions to the attorney.[9] Landers's first declaration also explained that, after returning from vacation, he returned Doctor's counsel's telephone calls and left messages but was not further contacted by Doctor's counsel or asked by them to explain the context or content of his conversation with Riley.[10]

Doctor opposed the motion for reconsideration, arguing Landers, although averring in his declaration what he did *not* say, was silent on what he did say to Riley during the conversation. Doctor also argued it was suspicious

[9] Minor's counsel noted the designation was made under the pressure of a time deadline, and it was not unusual to designate an expert without having obtained his opinion. Doctor's counsel conceded they had named economists on expert designations without having spoken to them.

[10] Doctor, attacking the credibility of Landers's claimed effort to call Doctor's counsel, rhetorically argues on appeal it would be an "inexplicable phenomenon" that defense counsel would have twice called Landers to obtain his input but then ignored him when he returned those calls. However, Landers's return calls were apparently made in late September or early October, consistent with Weadock's declaration that Landers had not contacted them "throughout the period necessary to prepare briefs on the Motion to Disqualify counsel," and were made after the court had preliminarily concluded that Doctor could rely on the *Shadow Traffic* presumption (because Landers was no longer available to them) and Doctor's motion should be granted. In this context, the failure to return calls becomes less inexplicable.

Landers did not immediately return Doctor's counsel's two mid-August telephone calls, but instead waited until after the court had tentatively ruled to disqualify Minor's counsel (and Minor's counsel left a message at Landers's office) before calling Medel to proclaim his availability as Doctor's expert, arguing the "sudden contact" seemed "contrived" and appeared to be "manufactured to assist [Minor's] counsel" on the *Collins* issue.[11]

In reply, Minor submitted a second declaration from Landers.[12] In his second declaration, Landers provided a verbatim description of the statements he made to Riley during the conversation. Landers's second declaration also explained why he had not immediately responded to the two mid-August telephone calls from Doctor's counsel (see fn. 5). Finally, Landers explained that after he returned from his extended vacation on October 2, he placed the telephone call to Medel (stating he remained available to serve as Doctor's expert) on his own initiative and Doctor's speculation the call was manufactured or manipulated by Minor's counsel was "totally preposterous and totally false."

The court concluded this evidence did not overcome the *Shadow Traffic* presumption, and denied the motion for reconsideration. This appeal followed.

II

LEGAL FRAMEWORK

A. *Attorney Disqualification Based on Confidential Information*

An attorney may not undertake or continue a representation adverse to a former client when the attorney has, because of his or her prior representation of the former client, obtained confidential information material to the new representation. (*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 759 [261 Cal.Rptr. 100].) The rule "seeks to protect the confidential attorney-client relationship" by barring the attorney

---

[11] Doctor also attacked Landers's veracity because (1) Landers averred he made "numerous" telephone calls to Doctor's counsel on returning from vacation but Doctor's counsel only had two messages from Landers during that period; (2) Landers claimed to have sent an e-mail to Doctor's counsel but none was received, and (3) Landers's preexisting relationship with Minor's counsel provided economic incentive for Landers to fabricate.

[12] Doctor moved to strike the second declaration as improperly attempting to raise new matter in the reply. Although the court stated it was striking the second declaration, its ruling on the motion for reconsideration appears to have considered Landers's second declaration but concluded it was nevertheless insufficient to justify granting the motion for reconsideration. We conclude, because the declaration was responding to speculations or arguments raised by Doctor in opposition to the motion for reconsideration, the second declaration was proper.

from acting in a new matter *substantially related* to the prior representation. (*Ibid.*) A former client moving to disqualify the attorney need not show the attorney *actually* possesses confidential information. Instead, after it is shown the former representation has a substantial relationship to the present action, and the confidential information material to the present action would normally have been imparted to the attorney during the course of the prior representation, the attorney's knowledge of the confidential information is presumed and disqualification is normally automatic. (*Id.* at pp. 759–760.)

■ Similar concerns arise when a nonlawyer employee of the client's attorney who obtained confidential information while working for the client's attorney is later hired by a new attorney, who then undertakes a representation adverse to that client to which the confidential information would be material. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 587–588 [283 Cal.Rptr. 732] (*Complex Asbestos*).) In this context, after it is shown the nonlawyer employee *actually* obtained confidential information from the former client, the court will presume such information was imparted to the new attorney. Accordingly, the new attorney will be disqualified unless the attorney shows the employee has been adequately screened from involvement in the matter so the confidential information in the employee's possession was not and will not be used or disclosed to the attorney. (*Id.* at pp. 592–596.)

■ The disqualification principles have also been extended to permit disqualification of an attorney who obtained information protected by the attorney work product privilege. (See *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, 657–659 [271 Cal.Rptr. 698].) When an attorney consults with an expert and obtains confidential information protected by the work product privilege, and the opposing attorney later acquires the privileged information during communications with that expert, the opposing attorney can be disqualified because, "[h]aving become privy to [the attorney's] work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case." (*Id.* at pp. 657–658.)

B. *The Evidentiary Rules: The Presumption*

■ When the disqualification motion is brought against an attorney based on his or her former work for a client, the moving client need not show the attorney *actually* possesses confidential information. Instead, the moving client need only show the former representation has a substantial relationship to the present action, so confidential information material to the present action would normally have been imparted to the attorney during the course of the prior representation. After this is shown, the attorney's knowledge of confidential information is *presumed*. "The presumption of knowledge is a

'rule by necessity' as the former client would be at a loss to prove what is in the mind of the attorney. Neither should the attorney be forced to evaluate the extent to which he [or she] acquired relevant information and his [or her] actual use of that knowledge in the current representation." (*Western Continental Operating Co. v. Natural Gas Corp., supra*, 212 Cal.App.3d at pp. 759–760.) Because disqualification is normally automatic (*ibid.*), the presumption appears to be conclusive rather than rebuttable.

### C. *The Presumption Extended and Modified: Complex Asbestos and Shadow Traffic*

■ In *Complex Asbestos*, the court concluded, in former-employee cases, the moving client must show the former employee *actually* obtained confidential information material to the present representation.[13] (*Complex Asbestos, supra*, 232 Cal.App.3d at pp. 592–596.) After this foundational showing is made, a presumption arises that the former employee used or disclosed the information in the current employment. This presumption, explained the *Complex Asbestos* court, is again "a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff." (*Id.* at p. 596.)

However, unlike the conclusive presumption applicable to attorneys, the *Complex Asbestos* court held the presumption in a former-employee case is a rebuttable one. It shifts the burden to the challenged attorney to show a firewall has been erected that screens the former employee from any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, because the absence of such a firewall would support a reasonable inference that the confidential information held by the former employee had been used or disclosed. If the challenged attorney does not convince the trial court that the practical effect of the screening process has achieved a barrier between the challenged attorney and the former employee's knowledge, the presumption is not rebutted and the court may disqualify the attorney and law firm. (*Complex Asbestos, supra*, 232 Cal.App.3d at p. 596.)

---

[13] The *Complex Asbestos* court was asked to adopt the *Western Continental* approach by presuming confidential information was obtained merely because the employee's former work was on a matter substantially related to the current action. (*Complex Asbestos, supra*, 232 Cal.App.3d at p. 595.) The *Complex Asbestos* court, rejecting that test, reasoned that "the substantial relationship test is a tool devised for presuming an attorney possesses confidential information material to a representation adverse to a former client. [Citation.] The presumption is a rule of necessity because the former client cannot know what confidential information the former attorney acquired and carried into the new adverse representation. [Citation.] *The reasons for the presumption, and therefore the test, are not applicable* though, when a nonlawyer employee leaves *and the attorney remains available to the client.* The client and the attorney are then in the best position to know what confidential attorney-client information was available to the former employee." (*Id.* at p. 595, italics added.)

In *Shadow Traffic*, the court addressed disqualification under *County of Los Angeles v. Superior Court, supra*, 222 Cal.App.3d 647 of an attorney who obtained information protected by the attorney work product privilege. (*Shadow Traffic, supra*, 24 Cal.App.4th 1067.) In *Shadow Traffic*, Metro Traffic Control (Metro) sued its competitor, Shadow Traffic Network (Shadow Traffic), for business torts. Attorneys for Metro interviewed members of an accounting firm to discuss their retention as expert witnesses on the complex damages issues, and Metro's attorneys extensively discussed their client's litigation and trial strategies, theories and legal analysis, and how the accountants could assist them. (*Id.* at pp. 1071–1073.)

Metro's counsel decided not to retain the accountants, and a few weeks later, attorneys for Shadow Traffic interviewed one of the same accountants. (*Shadow Traffic, supra*, 24 Cal.App.4th at pp. 1071–1073.) The accountant told the Shadow Traffic attorneys that Metro's attorneys had met with him to retain him for the identical issues, but had decided not to retain him; despite this warning, Shadow Traffic's attorneys spoke briefly with the accountant about the manner in which they expected Metro to attempt to calculate its damages, retained the accountant as their expert witness, and disclosed him to Metro as their expert witness. (*Id.* at pp. 1072–1074.)

The trial court granted Metro's motion to disqualify the attorneys, and the appellate court upheld the order. (*Shadow Traffic, supra*, 24 Cal.App.4th at p. 1089.) After first concluding the information imparted by Metro to the experts was confidential within the attorney work product privilege (*id.* at pp. 1078–1079), the court examined the "pivotal issue" (*id.* at p. 1084) of whether the experts had disclosed the confidential information to Shadow Traffic's attorneys. The *Shadow Traffic* court imported the *Complex Asbestos* test, analogizing the retained expert to the former employee, and concluded because the party seeking disqualification " 'will be at a loss to prove what is known by the adversary's attorneys and legal staff' " (quoting *Complex Asbestos, supra*, 232 Cal.App.3d at p. 596), the same rule of necessity made it appropriate to adopt the same rebuttable presumption that the information possessed by the adversary's legal staff (e.g., the retained expert) has been used or disclosed to the adversary's attorney. (*Shadow Traffic*, at p. 1085.) *Shadow Traffic* concluded that because "the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof. [Citation.] The effect of this type of presumption 'is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' (Evid. Code, § 606.)" (*Id.* at p. 1085.)

Thus, the conclusive presumption applied in former-attorney cases and the rebuttable presumption and burden-shifting rules applied to former-employee

or -expert cases are based on a similar rationale. In the former-attorney cases, the conclusive presumption is based on the recognition that the party seeking disqualification will be unable to prove what is subjectively known by the adversary's attorneys, because only the adversary's attorneys can know that. In the former-employee or -expert cases, the rebuttable presumption is based on the recognition that the party seeking disqualification will be unable to acquire evidence to prove what was communicated to the adversary's attorney by his legal staff or retained expert because those communications would themselves be protected by privilege.

### D. The Extended Presumption Limited: Collins

In *Collins*, the court evaluated whether *Shadow Traffic*'s rebuttable presumption applied where the moving attorney retained the expert but, following (and as the result of) subsequent communications between the challenged attorney and the expert, the challenged attorney designated the expert as his expert witness. (*Collins, supra*, 121 Cal.App.4th at pp. 1117–1119.) The trial court relied on *Shadow Traffic* to grant the motion to disqualify the challenged attorney, but the appellate court reversed. (*Collins*, at p. 1127.)

■ *Collins* first concluded the trial court's finding on the threshold issue in the *Shadow Traffic* analysis—the moving party's attorney disclosed confidential work product materials to the expert—was supported by substantial evidence. (*Collins, supra*, 121 Cal.App.4th at p. 1128.) However, *Collins* then held *Shadow Traffic*'s rebuttable presumption had no application because the expert remained a consultant to the moving party. (*Ibid.*) *Collins*, noting *Shadow Traffic* justified its burden shifting as " ' "a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff," ' " reasoned that "[w]hen the expert has gone to the other side and is no longer available to the side that originally retained him, the shifting of the burden of proof makes eminent sense." (*Collins*, at p. 1129.) However, *Collins* concluded the rebuttable presumption should *not* apply because the expert there remained a consultant to the moving party's counsel, and the moving papers did not show the expert was "no longer available to him for purposes of presenting evidence" demonstrating that confidential information was passed to the challenged attorney, and therefore "[t]he most important source of the information from which to ascertain whether [the expert] had passed on any confidential information to [the challenged attorney] remained in [the moving party's] hands. [¶] Under these circumstances, *the reason for shifting the burden of proof to the opposing party does not exist. We conclude the normal burdens of proof, wherein the party moving for relief must establish its right to it, is appropriate.*" (*Ibid.*, italics added, fn. omitted.) However, *Collins* cautioned it was "express[ing] no opinion as to whether the burden of proof should shift where

the expert is no longer communicating with the party that originally retained him." (*Id.* at p. 1129, fn. 9.)

## III

## ANALYSIS

### A. *Standard of Review*

The standard of review in attorney disqualification cases was synopsized by the court in *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th 1135, 1143–1144, in which the court explained: "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]"

Thus, where there are no material disputed factual issues, we review the trial court's determination as a question of law, and we defer to a trial court's express or implied factual decisions on disputed factual issues only if that decision is supported by substantial evidence. Importantly, although an inference can serve as substantial evidence for a finding, " 'the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.]' [Citation.] '[A] trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence.' " (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487 [71 Cal.Rptr.2d 179] [reversing order disqualifying attorney because finding that firewall was breached and confidential information was imparted to attorney was based on a speculative inference contradicted by affirmative evidence produced by challenged attorney that firewall was not breached and no confidential information was imparted].)

### B. *Summary of Analysis*

We conclude the trial court's order in this case must be reversed. First, we are convinced the trial court erroneously placed the burden of persuasion on

Minor to *disprove* that confidential information was imparted to Riley, and instead should have placed the burden of proof on Doctor to prove confidential information *was* imparted to Riley. Second, we are convinced the showing below was inadequate to meet Doctor's burden and therefore the misallocation of the burden of proof was not harmless.

### C. *The Erroneous Selection of the Burden of Proof*

The trial court stated it was not persuaded there was a "continued relationship between Landers and defense counsel" and therefore held that "[t]he rationale of *Collins* . . . is inapplicable."[14] Accordingly, the trial court concluded Minor was required to produce persuasive evidence to "overcome the presumption that confidential information was provided to [Minor's] counsel" under *Shadow Traffic*, and disqualified Minor's counsel when the evidence produced did not satisfy the court that the presumption was dispelled.

We are convinced, under the facts of this case, it was error to apply *Shadow Traffic*'s burden-shifting presumption because there was no legal impediment to Doctor's ability to obtain evidence from Landers on the content of the conversation to satisfy the burden of proof. When "the reason for shifting the burden of proof to the opposing party does not exist . . . the normal burdens of proof, wherein the party moving for relief must establish its right to it, is appropriate." (*Collins, supra,* 121 Cal.App.4th at p. 1129, fn. omitted.) For example, in *Complex Asbestos*, the moving party unsuccessfully urged that the *Western Continental* presumption (i.e., confidential information was obtained if the employee's former work was substantially related to the current action) should apply and relieve them of the burden to show *actual* acquisition. (*Complex Asbestos, supra,* 232 Cal.App.3d at p. 595.) However, after recognizing the burden-shifting presumption was based on and justified as a rule of necessity, and (in former-employee cases) that a source of evidence proving what confidential information was actually acquired by the former employee "*remains available* to the [moving party]," *Complex Asbestos* reasoned that "[t]he reasons for the presumption, and therefore the test, are not applicable . . . ." (*Ibid.,* italics added; see fn. 13, *ante.*) Similarly, in *Collins*, a source (indeed, the best source) for evidence to prove what confidential information was actually conveyed by the expert to the challenged attorney was *available* to the moving party, because the expert

---

[14] On Minor's motion for reconsideration, the trial court employed a slightly different verbal formulation when it stated its rationale for adhering to the burden-shifting presumption, stating *Shadow Traffic* applied because the evidence did not show "defense counsel . . . maintained control of Dr. Landers." We conclude that, although either articulation (e.g., did the moving party have "control over" the expert or have a "continued relationship with" the expert) would be *sufficient* for *Collins* to apply, neither articulation is a *prerequisite* to placing the burden of proof on the moving party rather than on the challenged party.

remained a consultant to the moving party's counsel, and the moving papers did not show the expert was unavailable to counsel for purposes of gathering and presenting evidence of what confidential information (if any) was conveyed. (*Collins*, at p. 1129.)

Here, there is no evidence Landers was legally unavailable to Doctor as a source for evidence of what confidential information Landers conveyed to Minor's counsel.[15] To the contrary, Doctor's August 11 letter to Riley specified Landers was and remained Doctor's confidential consultant, and there was apparently no legal impediment to Doctor obtaining a declaration or (if Landers was recalcitrant) a deposition from Landers describing the content of the conversation. Indeed, Minor's counsel (noting Doctor had made no efforts to obtain Landers's declaration or to even contact Landers after August 15) suggested Landers be deposed or be telephonically questioned by the court (see fn. 6, *ante*) concerning the conversation, but Doctor's counsel (although arguing the presumption should operate because the defense is "not in a position to . . . offer . . . proof" of the content of the conversation) chose to ignore those evidentiary avenues.

■ Doctor argues *Shadow Traffic* was properly applied, and *Collins* was properly rejected, because *Collins* obviates the presumption only when the expert remains under the control of the moving party, and the evidence here permitted the conclusion Landers was not within Doctor's control. We are unpersuaded by this effort to avoid *Collins*.[16] Certainly, *Collins* holds that retention of control over the expert is a *sufficient* basis for declining to apply

---

[15] Although the court barred Minor's counsel from contacting Landers, no similar restriction was imposed on Doctor's counsel. It is paradoxical that the court (by applying the *Shadow Traffic* presumption) mandated that Minor prove what Landers said, while barring Minor from contacting "[t]he most important source of the information from which to ascertain whether [the expert] had passed on any confidential information" (*Collins, supra*, 121 Cal.App.4th at p. 1129) and, having precluded Minor's ability to marshal evidence, concluded Minor's evidentiary presentation was unpersuasive.

[16] Doctor's other efforts to distinguish *Collins* are unpersuasive. Doctor argues *Collins* involved undisputed or stipulated facts (e.g., both the challenged attorney and the expert in *Collins* averred no confidential information was exchanged; the expert remained in the employ of the moving party) which made de novo review appropriate, in contrast to the disputed facts here. However, we have searched in vain for any reference in *Collins* to stipulated facts, and *Collins*'s discussion of "substantial evidence" supporting one of the trial court's implied findings (see *Collins, supra*, 121 Cal.App.4th at p. 1128) undercuts this reading of *Collins*. Moreover, Doctor's claim that *Collins* is distinguishable because both the challenged attorney and the expert averred no confidential information was exchanged mirrors rather than distinguishes this case. Indeed, the fact on which Doctor principally relies to raise the evidentiary dispute over whether confidential information was exchanged—e.g., that the challenged attorney here named the expert in his expert witness designation—was present in *Collins*. (*Id.* at p. 1119.)

the presumption, but *Collins* did not hold that it is a *necessary* predicate to retaining the ordinary burden of proof in lieu of the presumption.[17]

Because the impossibilities underlying both the conclusive presumption (applicable to former attorneys) and rebuttable presumptions (applicable when former employees have joined the legal staff of the challenged attorney) are absent (see pt. II. B., *ante*), the reasons for the presumption are not present. Accordingly, we conclude, based on the same rationale applied in *Collins* and *Complex Asbestos*, where the reasons for the presumption are absent, the presumption is not applicable.

### D. *The Evidence Cannot Support Disqualification*

If the presumption does not apply, "the moving party has the burden of proving that the confidential information it imparted to its expert witness has been transmitted to the opposing party." (*Collins, supra*, 121 Cal.App.4th at p. 1129.)

Riley denied receiving any confidential information, and denied even knowing that Doctor had retained Landers until Doctor's counsel so informed Riley after receiving the August 11 expert designation. Doctor submitted no direct evidence from Landers to impeach either Riley's description of the conversation or Riley's claim he was ignorant of the prior consultation between Doctor's counsel and Landers, and the declarations submitted in support of Minor's motion for reconsideration appear conclusively to demonstrate Doctor could not obtain that direct evidence. Doctor's showing is strikingly similar to the showing made by the moving party in *Collins*, and *Collins*'s evaluation of that showing is therefore apropos:

"Conspicuously absent from the moving papers in this case was a declaration from Dr. Clark [the expert] in which he might have indicated to the court that he had disclosed Navistar's [the moving party's] material confidential information to Purtill [the challenged attorney]. The only evidence supplied by [the moving party] was [the moving attorney's] declaration in which he stated he provided . . . privileged attorney work product in the form of his evaluation of the case.

"On this record, there is not the slightest hint that Dr. Clark disclosed a secret attorney-client communication from Navistar to its attorney about the

---

[17] Indeed, *Collins* by footnote "express[ed] no opinion as to whether the burden of proof should shift where the expert is no longer communicating with the party that originally retained him" (*Collins, supra*, 121 Cal.App.4th at p. 1129, fn. 9), suggesting that mere *absence* of communications between an otherwise available expert and the moving party—as is present here—required separate analysis.

windshields of its trucks. . . . The absence of this declaration raises a huge red flag against granting the motion to recuse in light of [the moving attorney's] sworn declaration that Dr. Clark is still Navistar's consultant.

"On the other hand, the uncontradicted evidence in this case from Purtill was that he did not know that Dr. Clark had been previously retained by Navistar until after he disclosed this witness and defense counsel notified him of the conflict.

"Importantly, Purtill swore under penalty of perjury that Dr. Clark had not disclosed anything to him that constituted confidential information from Navistar's counsel. We also stress that Purtill's testimony was independently confirmed by Dr. Clark. Dr. Clark declared, essentially, that he forgot he had spoken with anyone else about this case and therefore he could not have disclosed any information to Purtill about what he learned from the other side. [¶] In light of this uncontradicted evidence, we conclude that Navistar failed to demonstrate its confidential attorney work product was transmitted from Dr. Clark to [the challenged] counsel . . . . The trial court's recusal order cannot stand based on this undisputed testimony." (*Collins, supra*, 121 Cal.App.4th at pp. 1130–1131, fn. omitted.)

Doctor argues two pieces of evidence provided substantial evidence from which the trial court could infer the affirmative averments by Riley and Landers concerning the brevity and content of the conversation should be disbelieved in favor of the contrary conclusion that confidential information was disclosed during the conversation. However, we are unconvinced this evidence, either separately or together, provides substantial evidence that confidential information was disclosed during the conversation.

Doctor's primary evidentiary fact is that Riley designated Landers as an expert to testify about pulmonary embolisms and the standard of care, from which Doctor argues the trial court could infer the conversation necessarily encompassed substantive discussions during which Landers consciously or unconsciously revealed confidential attorney work product materials to Riley.[18] However, this fact—the challenged attorney had designated the expert—

---

[18] Doctor argues the inference of an extended substantive conversation is buttressed by (1) counsel's expertise at a subsequent mediation conference, and (2) Riley's purported dissembling during his August 15 telephone conversation with Medel. Even assuming there was competent evidence supporting these factual assertions, which there is not (see fns. 2 & 4, *ante*), neither fact supports a *reasonable* inference the conversation involved anything more than was described in Riley's declaration.

was also present in *Collins* but any resulting inference did not suffice to overcome the contrary affirmative evidence (from both the challenged attorney and the expert) denying substantive discussions took place. Moreover, Riley explained why he designated Landers despite the absence of any substantive discussions: the time deadline for designation was about to expire and he elected to designate Landers knowing he could withdraw Landers if subsequent substantive discussions proved he would not be helpful. Riley and Landers both averred, and Doctor's counsel conceded, attorneys occasionally designate experts before the expert has expressed an opinion to the designating attorney; Riley's contemporaneous followup letter to Landers, which stated Landers was to review the records and "upon your review of the enclosed records please call the undersigned to discuss your opinions and conclusions," buttresses Riley's description of the conversation; and the courts have recognized experts can be designated and then withdrawn. (See *County of Los Angeles v. Superior Court, supra*, 222 Cal.App.3d 647, 657 ["[A] party may, for tactical reasons, withdraw a previously designated expert witness, not yet deposed."].) Doctor argues we must defer to the trial court's decision to reject Minor's affirmative *evidence* (describing what was discussed and what triggered the expert designation) in favor of drawing the contrary *inference* that the conversation necessarily included substantive discussions.

In *Western Digital Corp. v. Superior Court, supra*, 60 Cal.App.4th 1471, an analogous argument was made by the party (Amstrad) who moved for and obtained an order disqualifying an attorney. There, the disputed issue was whether a screening wall, erected between the knowledgeable expert (Mr. Hankin) and the allegedly "tainted" expert (Mr. Carter), had been breached. Amstrad argued the trial court had substantial evidence to find such a breach because Carter invited Hankin to the meeting between Carter and the challenged attorney to aid in marketing their expert services to the attorney. Amstrad urged the court could infer Hankin and Carter discussed the case, notwithstanding their declarations denying any discussions, because a discussion would have benefited their marketing pitch to the attorney. The court found no substantial evidence to support the trial court's order disqualifying the attorney, and specifically rejected the claim that the above inference sufficed as substantial evidence, reasoning: "The inference suggested by Amstrad [the moving party] must be *reasonable* if it is to serve as substantial evidence for a finding that Amstrad's confidences were disclosed to Carter. '[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus,

an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.]' (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].) '[A] trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence. [Citation.]' (*Fullerton Union High School Dist. v. Riles* (1983) 139 Cal.App.3d 369, 383 [188 Cal.Rptr. 897].) [¶] The record contains direct evidence by way of declarations from Carter and Hankin establishing that the two never discussed the substance of the case. Amstrad's suggestion that the two did engage in such a discussion in advance of Carter's first meeting with [the attorney] is based on nothing but suspicion and conjecture. It is thus an unreasonable inference and cannot support a finding Hankin disclosed Amstrad's confidential information to Carter." (*Id.* at p. 1487.)

Doctor's remaining basis for the inference was that Landers did not respond to Doctor's two telephone messages (left in mid-August) but then did call Medel's office in October (while the motion to disqualify was pending) proclaiming he remained available to serve as Doctor's expert (see fns. 7 & 8, *ante*), which Doctor argued demonstrated Landers was a mere puppet of Minor's counsel and should be disbelieved. However, considering Landers's affirmative (and facially legitimate) explanation for these events,[19] Doctor's speculative and conjectural inferences of an improper relationship between Minor's counsel and Landers do not provide *substantial* evidence supporting the conclusion that the conversation included the disclosure of protected confidential information. (*Western Digital Corp. v. Superior Court, supra*, 60 Cal.App.4th 1471.)

E. *Conclusion*

 There is no competent evidence of sufficient substantiality that Landers disclosed confidential information to Riley during the conversation. Accordingly, the misallocation of the burden of proof cannot be deemed harmless, and we reverse the order disqualifying Minor's counsel.

---

[19] Landers explained why he had not received the two telephone calls when they were made, why he understood (upon receiving Weadock's mid-August letter) Doctor was terminating him as Doctor's consultant, and why he nevertheless (on his own initiative) called Doctor after returning from his extended vacation to express his continued willingness to serve as a defense consultant, and labeled Doctor's speculation that his conduct had been manipulated by Minor's counsel "preposterous and totally false."

## DISPOSITION

The order is reversed. Minor is entitled to costs on appeal.

McConnell, P. J., and O'Rourke, J., concurred.